**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

SCOTT A. W.,[1]

                                        Plaintiff,                    5:23-cv-131 (BKS)

v.

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

**Appearances:**

*For Plaintiff:*
Howard D. Olinsky
Olinsky Law Group
250 South Clinton Street, Suite 210
Syracuse, NY 13202

*For Defendant:*
Carla B. Freedman
United States Attorney
Johanny Santana
Special Assistant United States Attorney
Social Security Administration
6401 Security Boulevard
Baltimore, MD 21235

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

I.      **INTRODUCTION**

        Plaintiff Scott A. W. filed this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking

review of a decision by the Commissioner of Social Security (the "Commissioner") denying

Plaintiff's applications for Social Security Disability Insurance ("SSDI") benefits and

---

[1] In accordance with the local practice of this Court, Plaintiff's name has been abbreviated to protect his privacy.

Supplemental Security Income ("SSI") benefits. (Dkt. No. 1). The parties' briefs, filed in

accordance with N.D.N.Y. General Order 18, are presently before the Court. (Dkt. Nos. 12, 14).

After carefully reviewing the Administrative Record,[2] and considering the parties' arguments,

the Court reverses the Commissioner's decision and remands this matter for further proceedings.

## II.    BACKGROUND[3]

### A.    Procedural History

Plaintiff applied for SSDI and SSI benefits on January 17, 2018, alleging disability, as

relevant here, due to post-traumatic stress disorder ("PTSD"), depression, and anxiety, with an

alleged onset date of March 1, 2016. (R. 87–88, 174, 178). Plaintiff's claims were denied on

April 10, 2018. (R. 107). Plaintiff requested a hearing, (R. 113), which was held before

Administrative Law Judge ("ALJ") Gretchen Greisler on August 23, 2019, and December 4,

2019, (R. 39–84). Plaintiff was not represented by an attorney on either date. (R. 41, 52). On

March 2, 2020, the ALJ issued a decision finding that Plaintiff was not disabled within the

meaning of the Social Security Act. (R. 20–38). Plaintiff filed a request for review of that

decision with the Appeals Council, which denied review on November 30, 2021. (R. 1–6).

Plaintiff commenced this action on January 30, 2023. (Dkt. No. 1).

### B.    Plaintiff's Background and Hearing Testimony

Plaintiff was forty years old at the alleged onset of his disability and forty-four years old

at the time of the ALJ's 2019 hearing. (R. 56, 94). Plaintiff has a GED and has past work,

including as a taxi driver and a taxi dispatcher, and in fast food management. (R. 58–61). At the

hearing, Plaintiff testified that in 2010, Plaintiff "hurt [his] back," "got hooked on opiates," "got

---

[2] The Court cites to the Bates numbering in the Administrative Record, (Dkt. No. 9), as "R." throughout this opinion, rather than to the page numbers assigned by the CM/ECF system.

[3] Because Plaintiff's arguments relate solely to his mental health impairments, the Court limits its recitation of the facts to those needed for background and those relevant to Plaintiff's mental health impairments and related symptoms.

in trouble," and "went to jail" for one year. (R. 61–62). In 2016, Plaintiff's "father passed away" and Plaintiff's "health was getting bad." (R. 62). Plaintiff "messed up and went back to using," "violated [his] probation," and went back to prison "for two and a half years." (R. 62). Plaintiff attempted to work a part-time job at CoreLife Eatery in 2019 but was unable to continue working there due to problems standing. (R. 59). At the time of the hearing, he lived with his wife and son, who was then eighteen. (R. 57–58).

Plaintiff testified that in addition to his physical issues, his "mental health" affected his ability to work, and that "[p]rison really screwed [him] up a little bit." (R. 62). Plaintiff received mental health treatment once a week or "sometimes every two weeks," as well as medication. (R. 66). He explained that because of his mental health issues, he "just can't be around like a lot of people," that his "mind just races like constantly, it just never leaves [him] alone," that his anxiety prevents him from leaving his home, and that "it's hard for [him] to even be around [his] own family half the time." (R. 75). During the day, he reported that in addition to "stress[ing] and cry[ing]," he would "watch a little tv," "try to do little chores," like vacuuming, sweeping, doing a few dishes, and cooking, "try to do things with" his two grandkids, like "play[ing] little board games," and would "try to go to the grocery store." (R. 75–76).

### C.   Medical Evidence

#### 1.   Brownell Center for Behavioral Health

As indicated by Plaintiff's medical records, Plaintiff began intake with the Brownell Center for Behavioral Health in December 2017, where he was diagnosed with PTSD and agoraphobia with panic disorder. (R. 338). On January 28, 2018, Plaintiff described "symptoms of panic disorder with agoraphobia including panic attacks, rapid heartbeat, impulsive behavior, social isolation and avoidance of public spaces and crowds." (R. 337). He also "report[ed] symptoms of PTSD including hypervigilance, paranoia, flashbacks, sweaty face and palms,

nightmares, [a] sense of helplessness and guilt, and [a] perceived need for aggression that influence[d] his ability to sleep, maintain employment and have comfortable social interactions with family and friends." (R. 337). Plaintiff's treatment plan was to begin psychotherapy sessions with Cherie Aller, P-LMHC, occurring at least monthly, as well as to meet at least quarterly with Kristen Milburn, NP, "for psychological evaluation and medication management sessions." (R. 339, 342).

Plaintiff's medical records include notes on his progress and treatment at Brownell on multiple other dates, including on visits with NP Milburn on October 3, 2018, January 7, 2019, and September 26, 2019. (R. 484–94, 986–92). In mental status exams on those dates, NP Milburn noted the following: Plaintiff's grooming and hygiene were fair, he was cooperative, appeared his stated age, was well nourished, hydrated, and dressed appropriately, appeared alert and without apparent impairment in orientation, had generally intermittent eye contact, intact recent and remote memory, and generally fluent speech that was without evidence of dysarthria or pressure, did not exhibit psychomotor abnormalities, had an unremarkable gait, appeared to have normal muscle tone and strength, had generally linear and logical thoughts, did not exhibit psychosis or suicidal or homicidal ideation, had an anxious mood, and an affect congruent with his mood. (R. 488, 492, 990). On October 3, NP Milburn observed that his judgment, insight, and impulsivity were noted to be unremarkable, while on January 7 and September 26 they were described as "poor at this time." (R. 488, 492, 990). NP Milburn also recorded on both January 7 and September 26 that Plaintiff was disheveled, anxious, hopeless, and was tapping his feet throughout the appointment. (R. 488, 990).

### 2.    Crouse Health Chemical Dependency Treatment Services

Plaintiff also received outpatient services at Crouse Health Chemical Dependency Treatment Services beginning in May 2019. (R. 997, 1064). He received counseling with

CASAC Connie Arthur and medication management with addiction psychiatrist Dr. Szombathyne Meszaros. (R. 1064). On May 22, 2019, Dr. Meszaros diagnosed Plaintiff with, among other disorders, "bipolar affective disorder, depressed, severe, without psychotic features," and "PTSD chronic." (R. 1009).

Dr. Meszaros observed the following in mental status examinations on May 22, 2019, June 5, 2019, June 26, 2019, July 31, 2019, August 28, 2019, September 25, 2019, October 23, 2019, and November 13, 2019: Plaintiff was well-developed, overweight or slightly overweight, looked his stated age, had a steady gait, did not have involuntary movements noted or reported, had a thought process that was reality oriented, goal directed, linear, coherent, and logical, had normal associations, did not have delusions or auditory or visual hallucinations, had no suicidal or homicidal ideation, intent, or plan, had fair or good insight and judgment, was oriented to person, place, time, and situation, and appeared to have an adequate fund of knowledge. (R. 1008, 1013, 1018–19, 1024, 1035, 1041, 1048). Plaintiff was frequently noted to have no flight of ideas and a full affect. (R. 1008, 1013, 1018–19, 1024, 1030, 1035, 1041, 1048).

The examination reports for Plaintiff's Crouse visits noted that Plaintiff had a dysphoric mood and anxiety, ranging from mild to severe. (R. 1008, 1013, 1018–19, 1024, 1030, 1035, 1041, 1048). It was frequently noted that his concentration was impaired or slightly impaired, (R. 1008, 1013, 1024, 1041), and that he had a slightly impaired short-term memory or possibly a mild short-term memory deficit, (R. 1008, 1013, 1019, 1024, 1030). Twice he had a labile affect and twice he had fast speech (of which one time his speech was slightly pressured). (R. 1008, 1013, 1018).

### D.    Opinion Evidence

#### 1.    Dr. Jeanne A. Shapiro

Jeanne A. Shapiro, Ph.D., conducted a consultative examination of Plaintiff in February 2018. (R. 347–51). Dr. Shapiro diagnosed Plaintiff, in relevant part, with PTSD with panic attacks, unspecified bipolar and related disorder, and generalized anxiety disorder. (R. 351). Dr. Shapiro wrote that Plaintiff "appears to have": "moderate-marked limitations interacting adequately with supervisors, coworkers, and the public"; "moderate-marked limitations sustaining concentration and performing a task at a consistent pace"; and "marked limitations consistently regulating emotions, controlling behavior, and maintaining well-being." (R. 350–51).

#### 2.    Dr. S. Hennessey

S. Hennessey, Ph.D., a state reviewing psychologist, assessed Plaintiff's Mental Residual Functional Capacity in April 2018. (R. 30, 101–04). Dr. Hennessey opined that regarding understanding and memory, Plaintiff "is able to understand and remember detailed, non-complex instructions and work procedures without substantial limitation"; regarding sustained concentration and persistence, Plaintiff "possesses the attention/concentration and persistence necessary to complete detailed, noncomplex tasks, consistently on a sustained basis"; regarding social interaction, Plaintiff "is able to relate and respond in an appropriate manner without substantial limitations"; and regarding adaptation, "[a]lthough [Plaintiff] has some difficulty coping in stressful circumstances, there is no substantial limitation in the ability to adapt to customary changes in an ordinary work environment." (R. 104).

#### 3.    Dr. Szombathyne Meszaros

Szombathyne Meszaros, M.D. completed a psychiatric assessment of Plaintiff in November 2019. (R. 1055–60). Dr. Meszaros listed Plaintiff's diagnoses, including "bipolar

6

affective disorder type I, most recent episode hypomanic," and "PTSD, chronic." (R. 1055). Dr. Meszaros noted that Plaintiff's symptoms include "anxiety, impaired attention and concentration, racing thoughts, disorganized behavior, distractibility, talkativeness, [and] insomnia (if [he] does not take meds)." (R. 1055).

Dr. Meszaros opined the following with regard to Plaintiff's abilities. With respect to "understanding, remembering or applying information," Dr. Meszaros indicated Plaintiff had a marked or serious limitation in the ability to "[u]nderstand and learn terms, instructions, and procedures," "[i]dentify and solve problems," "[u]se reason and judgment to make work-related decisions," and "[s]equence multi-step activities," and an extreme limitation or inability to function in the ability to "[d]escribe work activity to someone else" and "[r]ecognize a mistake and correct it." (R. 1056). Dr. Meszaros explained that Plaintiff had "impaired attention and concentration, impaired judgment, distractibility, [and is] disorganized." (R. 1056).

With respect to "interacting with others," Dr. Meszaros indicated Plaintiff had a marked or serious limitation in the ability to "[u]nderstand and respond to social cues (physical, verbal, [and] emotional)," and "[k]eep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." (R. 1057). Dr. Meszaros explained that Plaintiff is "unable to recognize social cues" and is "overly talkative." (R. 1057).

With respect to "concentration, persistence, or maintaining pace," Dr. Meszaros indicated Plaintiff had a marked or serious limitation in the ability to "[p]erform at a consistent pace without interruption from symptoms or an unreasonable number and length of breaks," and "[s]tay on task," and an extreme limitation or inability to function in the ability to "[c]omplete tasks in a timely manner," "[m]aintain attention for [a] two-hour segment," "[i]gnore or avoid distractions while working," or "[w]ork in coordination with or proximity to others without being

unduly distracted." (R. 1057). Dr. Meszaros explained that Plaintiff is "distractible" and "unable to focus." (R. 1057).

With respect to "adapting or managing oneself," Dr. Meszaros indicated Plaintiff had a marked or serious limitation in the ability to "[m]anage psychologically based symptoms," and an extreme limitation or inability to function in the ability to "[r]espond to demands," "[m]ake plans independently of others," and "[d]eal with normal work stress." Dr. Meszaros explained that Plaintiff has "poor self care," "does not take meds as prescribed," and "does not follow [his] diet for diabetes." (R. 1058).

Dr. Meszaros estimated that Plaintiff is likely to be absent from work as a result of his symptoms or treatment for more than four days per month (noting that he "calls in sick frequently") and likely to never be late to work. (R. 1058).

### 4.    NP Kristen Milburn

Kristen Milburn, NP, and a co-signing physician completed a psychiatric assessment of Plaintiff in December 2019. (R. 608–15). NP Milburn listed Plaintiff's diagnoses, including, as relevant here, chronic PTSD and generalized anxiety disorder. (R. 610). She noted that Plaintiff "suffers from paranoia and struggles to leave the home and be around people. He believes people are judging him and that they want to hurt him." (R. 610). NP Milburn described Plaintiff's response to treatment as "positive w[ith] med management" and noted a decrease in "symptoms of paranoia helping [Plaintiff] to go outside." (R. 610). His prognosis was listed as "[g]ood w[ith] continued compliance w[ith] meds [and] therapy." (R. 610).

NP Milburn opined the following with regard to Plaintiff's abilities. With respect to "understanding, remembering or applying information," NP Milburn indicated that Plaintiff had a marked or serious limitation in the ability to "[d]escribe work activity to someone else," and "answer questions and provid[e] explanations." (R. 611). NP Milburn explained that Plaintiff's

"symptoms fluctuate day to day," and that "[t]here are some days that his anxiety is so high that he cannot focus on individual tasks because of his racing thoughts. If he is anxious he also struggles with short term memory as he is not processing what people are saying in order to remember it." (R. 611).

With respect to "interacting with others," NP Milburn indicated that Plaintiff had a marked or serious limitation in the ability to "[u]nderstand and respond to social cues (physical, verbal, [and] emotional)," "[k]eep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness," "[g]et along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes," and an extreme limitation or inability to function in the ability to "[i]nitiate or sustain conversation." (R. 612). NP Milburn explained that Plaintiff "spends most of his time in the house w[ith] family or alone. He reportedly does not like people because he does not trust them." (R. 612).

With respect to "concentration, persistence, or maintaining pace," NP Milburn indicated that Plaintiff has a marked or serious limitation in the ability to "[c]omplete tasks in a timely manner," "[m]aintain attention for [a] two-hour segment," "[i]gnore or avoid distractions while working," "[s]ustain an ordinary routine without special supervision," "[p]erform at a consistent pace without interruption from symptoms or an unreasonable number and length of breaks," and "[s]tay on task," and an extreme limitation or inability to function in the ability to "[w]ork in coordination with or [in] proximity to others without being unduly distracted." (R. 612). NP Milburn explained Plaintiff is "debilitate[d]" by "frequent panic attacks" and that "[h]is constant worry hurts his ability to focus or concentrate." (R. 612).

With respect to "adapting or managing oneself," NP Milburn indicated that Plaintiff has a marked or serious limitation in the ability to "[c]hange activities or work settings without being

disruptive," and "[r]espond appropriately to changes in a routine work setting," and an extreme limitation or inability to function in the ability to "[d]eal with normal work stress." (R. 613). NP Milburn explained that Plaintiff's "constant level of stress prohibits him from functioning in public on most days." (R. 613).

NP Milburn estimated that Plaintiff is likely to be absent from work as a result of his symptoms or treatment for more than four days per month and likely to be late to work for the same reasons for more than four days per month. (R. 613).

### E.    The ALJ's Decision Denying Benefits

ALJ Greisler issued a decision dated March 2, 2020, and determined that Plaintiff was not disabled under the Social Security Act. (R. 20–38). After finding, as an initial matter, that Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2017, (R. 25), the ALJ used the required five-step evaluation process to reach her conclusion.[4]

At step one, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since the alleged onset date of March 1, 2016. (R. 25). At step two, the ALJ determined that Plaintiff had "the following severe impairments: diabetes, polyneuropathy, obesity, a lumbar spine impairment, a depressive disorder, an anxiety disorder, and posttraumatic stress disorder (PTSD)." (R. 26 (citing 20 C.F.R. §§ 404.1520(c), 416.920(c))). The ALJ noted evidence in the

---

[4] Under the five-step analysis for evaluating disability claims:

> [I]f the Commissioner determines (1) that the claimant is not working, (2) that he has a "severe impairment," (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008) (quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004).

record of hypertension, tinea corporis, GERD, and a history of opioid dependence, but did not

find these impairments to be severe. (R. 26).

At step three, the ALJ found that Plaintiff "does not have an impairment or combination

of impairments that meets or medically equals the severity of one of the listed impairments in 20

CFR Part 404, Subpart P, Appendix 1." (R. 26 (citing 20 C.F.R. §§ 404.1520(d), 404.1525,

404.1526, 416.920(d), 416.925, 416.926)).[5]

The ALJ then proceeded to determine Plaintiff's residual functional capacity ("RFC")[6]

and found that Plaintiff had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and
> 416.967(b) except he can occasionally climb stairs and ramps but
> cannot balance on uneven surfaces, climb ladders, ropes or scaffolds
> or work at unprotected heights. The claimant cannot use foot
> controls. The claimant can perform simple, routine and repetitive
> tasks at a consistent, but not a fast production rate pace, such as
> would be experienced in assembly line type of work. The claimant
> can tolerate occasional contact with supervisors and coworkers but
> only incidental contact with the public. The claimant can perform
> work that does not involve working in close coordination with others
> or sharing of job tasks. The claimant can make simple work
> decisions and tolerate infrequent, gradually introduced work
> changes.

(R. 27–28). In making this determination, the ALJ followed a two-step process by which she first

"determined whether there is an underlying medically determinable physical or mental

impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other

symptoms," and then "evaluate[d] the intensity, persistence, and limiting effects of the

claimant's symptoms to determine the extent to which they limit the claimant's work-related

activities." (R. 28). The ALJ observed that Plaintiff alleged disability due to symptoms and

---

[5] Plaintiff does not challenge the ALJ's findings at steps one, two, or three.

[6] The regulations define residual functional capacity as "the most [a claimant] can still do despite" his limitations. 20 C.F.R. § 404.1545(a)(1).

impairments that include "anxiety, difficulty being around a lot of people, racing thoughts, problems paying attention, problems finishing what he starts, and trouble remembering things." (R. 29). Applying this two-step process, the ALJ found that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . the claimant's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the objective medical evidence, the claimant's treatment history, or his activities." (R. 32).

In coming to this determination, the ALJ summarized the evidence (including, as indicated, the objective medical evidence, Plaintiff's treatment history, and his activities), and considered the medical opinions in the record from Dr. Shapiro, Dr. Hennessey, Dr. Meszaros and NP Milburnand a co-signing physician. (R. 30–32, 104).

The ALJ found Dr. Shapiro's opinion—that Plaintiff had a "marked limitation consistently regulating emotions, controlling behavior, and maintaining well-being," as well as "moderate-marked limitations sustaining concentration and performing a task at a consistent pace and interacting adequately with supervisors, coworkers, and the public"—to be "not persuasive, as it was not supported by [her] examination findings, which included intact attention and concentration, adequate social skills, and being cooperative" and that the "opinion was not entirely consistent with other evidence of record, including [Plaintiff's] activities." (R. 30).

The ALJ found Dr. Hennessey's opinion—that Plaintiff did not have substantial limitations in most areas considered and that "although the claimant had some difficulty coping in stressful circumstances, there was no substantial limitation in his ability to adapt to customary changes in an ordinary work environment"— "persuasive, as it was supported by [Dr.

Hennessey's] detailed explanation, and was consistent with the totality of the record, including the course of [Plaintiff's] treatment, his activities, and the negative clinical findings." (R. 31).

The ALJ found Dr. Meszaros' opinion—that Plaintiff "had marked and extreme limitations in several areas and would likely be absent from work about four days per month"—to be "less persuasive," because such conclusions "were not supported by Dr. Meszaros' treatment notes and were not consistent with other evidence of record, including [Plaintiff's] activities and negative clinical findings." (R. 31–32).

Finally, the ALJ found the opinion of NP Milburn and the co-signing physician—that Plaintiff had "a marked or serious limitation and extreme limitation or an inability to function" in certain areas causing him to "likely be absent from work more than four days per month" and "likely [to be] late to work more than four days per month"—to also be "less persuasive" because the "clinical findings did not support such marked and extreme limitations," "[t]heir opinion was not consistent with other evidence of record, including [Plaintiff's] activities and negative clinical findings" and that Plaintiff "generally is able to maintain conversations and report an accurate history to his providers." (R. 32).

At step four, relying on the testimony of a vocational expert, the ALJ determined that Plaintiff was incapable of performing his "past relevant work" as a manager in fast food services, as a taxi driver, or as a taxicab starter, (R. 32–33 (citing 20 C.F.R. §§ 404.1565, 416.965)), but, "[c]onsidering the [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform," including work as a mail clerk, marker II, or a photocopying machine operator, (R. 33 (citing 20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, 416.969(a))). Accordingly, the ALJ found Plaintiff "not disabled" under the Social Security Act. (R. 34).

### III.   STANDARD OF REVIEW

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine de novo whether Plaintiff is disabled. Rather, the Court must review "the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). "Substantial evidence is 'more than a mere scintilla.' It means such *relevant* evidence as a *reasonable* mind might accept as adequate to support a conclusion." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (per curiam) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court may reject the facts that the ALJ found "only if a reasonable factfinder would *have to conclude otherwise*." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)). The Court, however, must also determine whether the correct legal standard was applied. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). "[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).

### IV.   DISCUSSION

Plaintiff argues that "[t]he ALJ's mental RFC is unsupported by substantial evidence as she failed to properly evaluate the mental opinion evidence," specifically challenging the consideration of the supportability factor with respect to Dr. Meszaros and NP Milburn's opinion evidence. (Dkt. No. 12, at 11–17). The Commissioner responds that "contrary to Plaintiff's

argument, the ALJ assessed both the supportability and consistency of Dr. Meszaros and NP Milburn's opinions, assessing their supportability with their own treatment notes, and consistency with the other medical evidence and non-medical evidence in the record." (Dkt. No. 14, at 17–18).

Under the applicable regulations, the Commissioner must consider medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "[o]ther factors." 20 C.F.R. § 404.1520c(a)–(c). The ALJ is required to "articulate how [she] considered the medical opinions" and "how persuasive [she] find[s] all of the medical opinions." *Id*. § 404.1520c(a)–(b). The two "most important factors" for determining the persuasiveness of medical opinions are supportability and consistency, and an ALJ is required to "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions." *Id.* § 404.1520c(b)(2).

With respect to "supportability," the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).[7] An

---

[7] Plaintiff does not challenge whether the consistency factor was properly analyzed with respect to the opinion evidence.

ALJ must consider, but is not required to discuss, the three remaining factors when determining the persuasiveness of a medical source's opinion. *Id.* § 404.1520c(b)(2).

An ALJ's failure to explain the supportability and consistency of the medical opinions in the record is procedural error. *Loucks v. Kijakazi*, No. 21-cv-1749, 2022 WL 2189293, at *2, 2022 U.S. App. LEXIS 16829, at *3 (2d. Cir. June 17, 2022) (summary order). However, "if a searching review of the record assures [the court] that the substance of the [regulation] was not traversed," the court may affirm the Commissioner's decision. *Id.*, 2022 WL 2189293, at *2, 2022 U.S. App. LEXIS 16829, at *4 (internal quotation marks omitted) (quoting *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019)).

### 1.    NP Kristen Milburn

Plaintiff argues that "the ALJ failed to properly consider the important factor of supportability," in evaluating NP Milburn's opinion and that the "error is not harmless" because "had the opinion of NP Wilburn [sic] been properly considered Plaintiff would have at least one extreme or two marked limitations," which would have led to a finding that Plaintiff was disabled. (Dkt. No. 12, at 15–16). The Commissioner responds that the required factors were considered. (Dkt. No. 14, at 17–18).

As summarized by the ALJ, NP Milburn and a co-signing physician opined that Plaintiff "had a marked or serious limitation and extreme limitation or an inability to function in several . . . areas, would likely be absent from work more than four days per month, and would likely be late to work more than four days per month." (R. 32). After summarizing objective clinical findings from Plaintiff's mental status exams with NP Milburn, (R. 31), the ALJ concluded NP Milburn and the co-signing physician's opinion was "less persuasive" because "their clinical findings did not support such marked and extreme limitations" and because [t]heir opinion was not consistent with other evidence of record, including the claimant's activities and negative

clinical findings." (R. 32). The ALJ also noted that Plaintiff "generally is able to maintain conversations and report an accurate history to his providers." (R. 32).

Here, the ALJ explicitly referenced the supportability factor in accordance with the regulations. Therefore, unlike the case Plaintiff references where the ALJ "does not mention supportability at all," (*see* Dkt. No. 12, at 15 (citing *Karli D. v. Comm'r of Soc. Sec.*, No. 22-cv-655, 2023 WL 3004012, *7, 2023 U.S. Dist. LEXIS 68082, at *19 (N.D.N.Y. Apr. 19, 2023)), "this is not a case in which the ALJ has completely failed to provide any indication that she considered the supportability factor or failed to provide any explicit analysis about that factor." *Alice M.W. v. Comm'r of Soc. Sec.*, No. 20-cv-1122, 2022 WL 833566, at *6, 2022 U.S. Dist. LEXIS 50122, at *19 (N.D.N.Y. Mar. 21, 2022) (Peebles, M.J.).

Although it is apparent that the ALJ did consider supportability, Plaintiff makes several objections to the sufficiency of the ALJ's analysis. Plaintiff states that the ALJ "failed to mention any objective findings to support her conclusion" regarding whether the limitations were supported by the clinical findings. (Dkt. No. 12, at 14). This is false, as the ALJ discussed NP Milburn's clinical findings from October 2018 and January 2019. (R. 31). Plaintiff does point to specific findings that the ALJ did not mention,[8] but as the Commissioner correctly notes, an ALJ is not required to discuss every piece of evidence in the record so long as it is possible to discern the ALJ's reasoning. (*See* Dkt. No. 14, at 18 (citing *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (per curiam))). And to the extent Plaintiff disputes the *factual* finding that Plaintiff "generally is able to maintain conversations and report an accurate history to his providers," (R. 32), this is not relevant to the *procedural* issue of whether the ALJ conducted the supportability

---

[8] Some of the evidence Plaintiff argues should have been considered does not involve NP Milburn's clinical findings. (*See* Dkt. No. 12, at 14–15). Such evidence does not refute the ALJ's reasoning that NP Milburn's clinical findings did not support NP Milburn and the co-signing physician's opinion.

analysis appropriately. *See Loucks*, 2022 WL 2189293, at *2, 2022 U.S. App. LEXIS 16829, at *3 (stating that "failing to explain how [the ALJ] considered the" supportability factor is "procedural error").

However, Plaintiff also points out that the ALJ did not "note[] or discuss[]" the explanations provided by NP Milburn and the co-signing physician for their opinion. (Dkt. No. 12, at 13). In addition to objective medical evidence, the regulations indicate that an ALJ should also consider the "supporting explanations" provided by the medical source." *See* 20 C.F.R. § 404.1520c(c)(1). Courts in the Second Circuit have found that an ALJ's failure to indicate how those supporting explanations were considered is error. *See Rodriguez v. Kijakazi*, No. 21-cv-2358, 2022 WL 3211684, at *12, 2022 U.S. Dist. LEXIS 141931, at *38 (S.D.N.Y. Aug. 9, 2022) (McCarthy, M.J.) ("[A]n ALJ's rejection of a particular opinion based on the underlying clinical findings, without addressing the source's 'explanations and what he considered in arriving at his opinion,' ordinarily constitutes error." (quoting *Balotti v. Comm'r of Soc. Sec.*, 605 F. Supp. 3d 610, 618 (S.D.N.Y. 2022) (Lehrburger, M.J.))); *Balotti*, 605 F. Supp. 3d at 618 (determining the ALJ committed error where in "finding Dr. Appel's opinion less persuasive, the ALJ nowhere referred to any explanation that Dr. Appel gave to support his opinion"). In this instance, while the ALJ referred to a discrepancy between the clinical findings and NP Milburn and the co-signing physician's opinion regarding Plaintiff's limitations, the ALJ did not discuss any of the supporting explanations provided for that opinion. (*See* R. 23–34). Accordingly, the ALJ committed legal error with regard to the supportability analysis of NP Milburn and the co-signing physician's opinion and, for the reasons discussed below, remand is appropriate. *Rivera v. Comm'r of the Soc. Sec. Admin.*, No. 19-cv-4630, 2020 WL 8167136, at *14, 2020 U.S. Dist. LEXIS 245361, at *42 (S.D.N.Y. Dec. 30, 2020), *report and recommendation adopted*, 2021

WL 134945, 2021 U.S. Dist. LEXIS 7553 (S.D.N.Y. Jan. 14, 2021) ("If the ALJ fails adequately to 'explain the supportability or consistency factors,' or bases her explanation upon a misreading of the record, remand is required." (citation omitted)).

### 2.   Dr. Szombathyne Meszaros

Plaintiff here too contends that the ALJ "failed to conduct a proper supportability analysis" by omitting Dr. Meszaros' explanations accompanying the opinion. (Dkt. No. 12, at 17). He argues that the "error is not harmless" because "had the opinion of Dr. Meszaros been properly considered Plaintiff would have at least one extreme or two marked limitations," which would have led to a finding that Plaintiff was disabled. (*Id.* at 17). The Commissioner responds that the required factors were considered. (Dkt. No. 14, at 17–18).

In her decision, the ALJ summarized Dr. Meszaros' opinion as finding Plaintiff "had marked and extreme limitations in several areas and would likely be absent from work about four days per month." (R. 31–32). After discussing the limited nature of the positive clinical findings, (R. 31), the ALJ concluded Dr. Meszaros' opinion was "less persuasive" because "[t]he marked and extreme limitations and absences from work were not supported by Dr. Meszaros' treatment notes and were not consistent with other evidence of record, including the claimant's activities and negative clinical findings." (R. 32).

As with the previous opinion, this is not an instance where no supportability analysis was conducted. *See Alice M.W.*, 2022 WL 833566, at *6, 2022 U.S. Dist. LEXIS 50122, at *19. The ALJ expressly considered the objective clinical findings regarding Plaintiff's mental state between May 2019 and November 2019, and found that they did not suggest the limitations described in Dr. Meszaros' opinion. (R. 31–32). But, as with the previous opinion, Plaintiff correctly notes that the ALJ did not discuss Dr. Meszaros' explanations of the opinions provided. (Dkt. No. 12, at 16–17; *see also* R. 23–34). And for the same reasons as previously described,

failure to do so was improper. *Rodriguez*, 2022 WL 3211684, at *12, 2022 U.S. Dist. LEXIS 141931, at *38; *Balotti*, 605 F. Supp. 3d at 618. Accordingly, the ALJ committed error by failing to conduct a proper supportability analysis regarding Dr. Meszaros' opinion and remand is appropriate for this reason as well. *Rivera*, 2020 WL 8167136, at *14, 2020 U.S. Dist. LEXIS 245361, at *42.

### 3. Harmless Error

Finally, although the Commissioner broadly argues that "the ALJ assessed both the supportability and consistency of Dr. Meszaros and NP Milburn's opinions," by "assessing their supportability with their own treatment notes, and consistency with the other medical evidence and non-medical evidence in the record," (Dkt. No. 14, at 17–18), the Commissioner has not responded to Plaintiff's more specific argument regarding the ALJ's failure to discuss Dr. Meszaros and NP Milburn's explanations in the context of supportability. In any event, because nothing in the record would permit the Court to understand why the explanations that Dr. Meszaros and NP Milburn provided in support of their opinions were discounted, *cf. Glenn G. v. Kijakazi*, No. 22-cv-824, 2023 WL 2477501, at *7, 2023 U.S. Dist. LEXIS 41463, at *17–18 (D. Conn. Mar. 13, 2023) ("[I]t is a familiar extension of a longstanding principle in Social Security jurisprudence which guides that remand is not necessarily warranted for legal errors if 'the record evidence permits [a court] to glean the rationale of the ALJ's decision.'" (quoting *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (summary order)), because both Dr. Meszaros and NP Milburn found marked to extreme limitations in all four areas of functioning, (R. 611–13, 1056–58), and because the there is no indication that the ALJ accounted for marked to extreme limitations in formulating Plaintiff's RFC, the Court concludes that the ALJ's procedural error was not harmless in this case, *see, e.g.*, *Melissa C. o/b/o M.C. v. Kijakazi*, No. 20-cv-0885L, 2022 WL 167534, at *3, 2022 U.S. Dist. LEXIS 8831, at *6 (W.D.N.Y. Jan. 18,

2022) (remanding, finding that the ALJ's error could not "be said to be harmless ," where "reassessment of [the plaintiff's] limitations in these areas could potentially result in a finding of marked limitations in two of those functional domains, or an extreme limitation in one."). Accordingly, remand is required.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **REVERSED**, and this action is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Decision and Order; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: <u>May 6, 2024</u>
      Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge